ESSEX COUNTY ORPHANS COURT.

In the matter of the estate of HENRY M. OLIVER, deceased.

[Decided April 24th, 1925.]

Accounting—Executor—Exceptions—Insurance Payments to Executor Personally Under the "Facility of Payment Clause" of Policy, Accountant Must Charge Himself With Payment—Evidence Showed That Accountant Should Charge Himself With Value of Diamond Ring, Ownership of Which was in Dispute—Fiduciaries Not Entitled to Commissions Until Allowed by Court—Rules in Cases Where Business of Testator is Carried on by Trustee With and Without Authority—Burden of Proof on Accountant to Sustain Account—Payment of Usury to Secure Money to Pay Estate Debts Not Necessary, at least Not in Present Case—Exceptions Must be With Sufficient Fullness to Enable Adversary to Meet Them With His Evidence.

On exceptions to account.

*Messrs. Wolber & Gilhooly,* proctors for accountant.

*Mr. Henry L. Quackenbush,* proctor for exceptant.

KOCHER, ADVISORY MASTER.

Ellis S. Oliver, the executor of the last will and testament of Henry M. Oliver, filed his account as such executor, to which account Ethel D. Feytel, one of the residuary legatees under the last will and testament of the said Henry M. Oliver, deceased, has filed nineteen exceptions, which will be considered in their order.

In and by her first exception exceptant seeks to surcharge the accountant with the sum of $1,000, the proceeds of an insurance policy issued by the Aetna Insurance Company on the testator's life.

It was stipulated by counsel that this exception should be allowed.

In and by her second exception exceptant seeks to surcharge the accountant with the sum of $618.96, being the proceeds of certain insurance policies on the testator's life, commonly known as industrial policies, which were issued by the Prudential Insurance Company.

The accountant, in his testimony, admitted the existence of these policies, and stated that he believed they amounted to $578.92. He, however, denies having collected them from the insurance company, or having received a check for their proceeds, although he says that he did receive the proceeds. The check issued by the insurance company, in payment of these policies, was put in evidence, and I am satisfied that accountant did, on or before March 25th, 1915, receive from the insurance company its check for $618.96, representing the proceeds of these policies, which check was made payable to him individually, and was endorsed by him individually, and not as executor.

The testimony is convincing that these insurance policies, by their terms, bind the insurance company to pay the proceeds thereof upon the death of the insured to his executors or administrators, unless settlement should be made under the provisions of the so-called "facility of payment clause," which each policy contained, and which provided, in substance, that the insurance company might pay the proceeds of the policies to any relative by blood or connection by marriage of the insured, or to any other person appearing to the company to be equitably entitled to the same by reason of having incurred expense in any way on behalf of the insured for his burial, or for any other purpose, and that the production by the company of proof that payment to any or either of said persons should be conclusive evidence that such sum had been paid to the person or persons entitled thereto, and that all claims under the policies had been fully satisfied.

I am further satisfied that the insurance company paid the said sum of $618.96 to the accountant, and that the accountant received said sum individually under the aforesaid "facility of payment clause," and not as executor.

Essex County Orphans Court—In re Oliver.

The question now to be decided is whether the accountant, having received the proceeds of these policies individually, must, nevertheless, now account therefor as executor.

Insurance policies of this nature have been considered by our courts in a number of reported cases, the earliest of which appears to be *Metropolitan Life Insurance Co.* v. *Schaffer, 50 N. J. L. 72,* decided by the supreme court in 1887. It is, however, to be noted that in this case the terms of the promise to pay and of the "facility of payment clause" of the insurance policies were somewhat different, the agreement to pay being "to the person or persons designated in" the "facility of payment clause," and the persons named in this clause being "the beneficiary [named by the insured], an executor or administrator, husband or wife, or relative by blood, or connection by marriage of the assured." This proves to have been the form of these policies used by the Metropolitan Life Insurance Company, and policies containing substantially the same provision were considered in *Brooks* v. *Metropolitan Life Insurance Co. (1903), 70 N. J. Law 36; Metropolitan Life Insurance Co.* v. *Hooppel (1909), 76 N. J. Eq. 94,* and *Marzulli* v. *Metropolitan Life Insurance Co. (1910), 79 N. J. Law 271.* This form does not, however, appear to have been used by the Prudential Insurance Company, or, at least, not in any reported case.

The first reported case in this state in which a policy with terms substantially similar to those under consideration in the case at bar appears to have been considered in *Prudential Insurance Co.* v. *Godfrey (1909), 75 N. J. Eq. 484; affirmed, 77 N. J. Eq. 267.* In that case, on an interpleader suit by the insurance company, it was held that the administrator of the assured was entitled to the funds, and Vice-Chancellor Walker (now chancellor), speaking for the court of chancery, used the following language:

"My judgment is that the complainant had a right to pay any one of the persons named in the facility of payment clause in the policy under consideration up to the time that suit was brought by the person entitled to payment under

the contract, namely, the administrator of the insured, and that such payment would be a complete defense to the administrator's action, but, not having made such payment, the right of the administrator under the contract, upon suit brought, was complete, and that a plea by the company of subsequent payment to one of the class mentioned would not operate to bar the administrator's suit."

The first proposition embodied in the foregoing quotation was recently upheld in *Slingerland* v. *Prudential Insurance Co. (1920), 94 N. J. Law 532*, in which judgment for the defendant in an action brought by the executor of the assured against the insurance company after payment by it to a person named in the "facility of payment clause" was affirmed by the court of errors and appeals.

A case almost identical in its facts with the one under consideration is *Allen* v. *Allen (1918), 88 N. J. Eq. 575*. That case arose upon an application by an administratrix to the orphans court for an order to sell real estate to pay debts of the decedent. The application was resisted by the heir on the ground that the administratrix, who was the decedent's widow, had collected the proceeds of an insurance policy similar in its terms to those now under consideration, and it was admitted that if the amount of the policy were to be included as a part of the assets of the estate there would be no deficiency of personal assets and no necessity for selling the land for the payment of decedent's debts. The widow, however, contended that she had received the money individually under the "facility of payment clause," not as administratrix. The orphans court denied the application, and its decree was affirmed by the prerogative court and the court of errors and appeals. In the opinion of the latter court the following language was used: .

"The payment thus made by the insurance company in the exercise of its option did not operate *ipso facto* to confer upon the payee of the funds any legal right of property therein, but constituted the payee a constructive trustee, who held the fund in trust for the benefit of the estate. The express cove-

nant in the present policy emphasizes that situation, for the language is that the insurer for the consideration named promises to pay  *  *  *  unto the executors, administrators or assigns of Edward B. Allen the sum of $500. The fact that to this promise is superadded a provision which is intended to enable the insurer, for its own convenience, to facilitate payment, so as to speedily discharge itself from its obligation on the policy, and, incidentally, enable it to provide speedy aid to the family of the insured, presumably in a period of distress, does not lessen the legal liability of the recipient of the funds, as constructive trustee for the legal beneficiary under the plain terms of the policy."

So, in *Caveney* v. *Healey* (*1920*), *94 N. J. Law 28,* the insurance company paid the policies in question to the defendant under the "facility of payment clause," and thereafter the administrator of the insured brought suit at law against the payee to recover the amount so paid. Judgment for the plaintiff was affirmed by the supreme court, and Mr. Justice Swayze, delivering the opinion of the court, used the following language:

"The question now presented is whether the payment by the company effected a change of the original contract by which the company agreed to pay the executors or administrators of the insured. Such was not the view of this court as to the facility of payment clause in the original case. *Metropolitan Life Insurance Co.* v. *Schaffer, supra.* We there held that the facility of payment clause operated as an appointment both by the assured and the beneficiary of persons any of whom are authorized to receive payment of the sum agreed to be paid. We did not there decide that such payment to one appointed to receive it changed the beneficial interest in the fund from the assured or the beneficiary, or both, to the appointee, who was only to receive the money. To have so held would have put it in the power of the debtor, the insurance company, by its mere act, perhaps at its mere whim, to determine who should be beneficially entitled, and would be inconsistent with the manifest intent to make a con-

tract enforceable against the company. This intent appears in the agreement to pay to executors or administrators. No contract could arise out of the facility of payment clause, since, as Vice-Chancellor Stevenson has pointed out, no member of the classes therein mentioned could have enforced a claim against the company. The claim of all, under that clause, was in the clouds until the company made the actual payment. *Metropolitan Life Insurance Co.* v. *Hooppel, supra.* There are none of the characteristics of a contract about such an agreement. The clause was for the convenience of the company to enable it to make prompt payment, with the certainty that the validity of the payment could not be thereafter questioned. It probably arose, as we suggested in the *Schaffer Case,* out of the original, somewhat limited function of this class of policies to furnish a burial fund. As the business developed and became more and more an insurance business, evidenced by the use of the word 'insure,' and later the words 'insure and endow,' the burial fund features lost their relative importance and the life insurance features became more emphasized, until in *Prudential Insurance Co.* v. *Godfrey, supra,* it was held that the right of the company under the facility of payment clause existed only up to the time that suit was brought by the administrator. This view was affirmed by the court of last resort. *77 N. J. Eq. 267.* We think the administrator was the beneficial owner of the fund, and entitled to recover it from the defendant."

This case was affirmed by the court of errors and appeals on the opinion below. *95 N. J. Law 245.*

These cases appear to dispose of the issue in this case.

The exception will therefore be sustained.

In and by her third exception exceptant seeks to surcharge the accountant with approximately $500, the proceeds of certain insurance policies on the lives of others than the decedent, the premiums on which policies have been paid by the decedent.

By stipulation of counsel this exception was allowed to the extent of $313.89.

In and by her fourth exception exceptant seeks to surcharge the accountant with the sum of $100.24, moneys of the decedent on deposit with the West Hudson Trust Company.

It was stipulated by counsel that the amount on deposit was $104.24, plus $4.94 interest, and that the exception should be allowed in the sum of $109.16.

In and by her fifth exception exceptant seeks to surcharge the accountant with moneys of the decedent on deposit in the Broad and Market National Bank, alleged to amount to $11.

By stipulation of counsel it was agreed that the exception should be allowed to the extent of $9.35.

In and by her sixth exception exceptant seeks to surcharge the accountant with the value of a diamond ring belonging to the testator. It appears to be undisputed that the testator did, in his lifetime, own such a ring, and that before his death he pledged it with a pawnbroker for a loan, and it is admitted by the accountant that the ring is now in the possession of his wife—as security he says—for a loan of $250 from her to him.

The accountant testified that his father, the decedent, "previous before he died," gave him the pawn ticket and told him to keep the ring, but he later testified that his father, "some time before he died," gave him $225 for the ring, "with the understanding that it was mine if anything ever happened to him, or I could buy it back at that price at any time." Of course, all this testimony is incompetent under the well-settled rule in *Smith* v. *Burnet, 35 N. J. Eq. 314:* but, assuming it to be competent, it would seem to amount practically to an admission that the ring was the property of the decedent at the time of his death. Mrs. Canon, a daughter of the decedent, testifies that he told her some weeks before his death that he had given the ring to the accountant, and she says that at that time the accountant had the pawn ticket in his possession, but, so far as appears, this conversation might well have taken place before the purchase of the ring by the tes-

tator for $225, testified to by the accountant, and the force of her story is further weakened by her subsequent testimony that, after her father's death, there were numerous discussions between the parties in interest, including herself, on the subject of who should have the ring, thus negativing any general belief or understanding among them that the ring belonged to the accountant.

On the other hand, the exceptant, who is also a daughter of the testator, testified that the ring belonged to her father at the time of his death, and testator's widow, now Mrs. Noble, testifies that he gave it to her.

It appears to be unnecessary to weigh these conflicting stories, because there is uncontradicted testimony in the case which appears to dispose of the question of ownership. Mrs. Noble testified that in October, 1915, she asked the accountant for some money; that he gave to her $25 in cash, but had her endorse to him his check to her order for $55. In answer to her request for an explanation of the discrepancy, accountant stated that the $30 was for interest on the ring. This conversation is not denied by the accountant, and it would be difficult to conceive of a more unequivocal admission on his part that the ring did not belong to him.

There appear to no difficulty in sustaining this exception, but there is considerable difficulty in fixing the amount with which the accountant should be charged. The case is barren of testimony as to the value of the ring in question. The only basis for fixing any is contained in the accountant's own statement that he has borrowed $250 on the security of the ring. It follows, therefore, that it must be worth more than that amount. On the other hand, it may be that the accountant has paid out money to redeem the ring, for which he would, of course, be entitled to credit. The difficulty, however, is of the accountant's own making, and he cannot be permitted to profit by it. The ring is, as has been seen by his own admission, in his possession or in that of his wife, and he can easily produce it, together with expert testimony as to its valuation, and also with testimony as to the amounts, if any,

that should be credited to him in connection with its redemption.

I will therefore provisionally fix the value of the ring at the arbitrary amount of $500, giving to the accountant a reasonable opportunity to take further testimony on the subject if he so desires, in which event the exceptant will also, of course, have the same privilege, including the right to have the ring examined and appraised by her own experts. It is quite possible that counsel for both parties can agree as to the amount. Failing such testimony or stipulation the exception will be sustained in the amount of $500.

The seventh and eighth exceptions have been withdrawn.

Exceptant in and by her ninth exception objects to an allowance prayed by the accountant for executor's commissions paid to himself and totaling $400.

The rule that executors and other fiduciaries are not entitled to commissions unless and until allowed by the court is so thoroughly settled as to make any citations of authorities superfluous.

The exception will therefore be sustained.

In and by her tenth exception exceptant objects to an allowance prayed by the accountant for moneys amounting to $504 paid to himself for services at the factory conducted by the decedent in connection with the business in which the latter was engaged up to the time of his death. Such services were stated to have been rendered during a period of seven months, beginning March 16th, 1915.

As the testator died March 20th, 1915, substantially this entire item relates to services alleged to have been performed after his death. The accountant and two other witnesses testified as to the length of time during which these services were rendered and also as to their nature, and particular stress was laid upon the question whether what was done should be considered as being services rendered by accountant in carrying on decedent's business, or services rendered in preserving the estate in reducing it to cash. It seems quite unnecessary to decide this question, because the result would be the same in either case. The rule on this subject is laid

down in *Gilligan* v. *Daly, 79 N. J. Eq. 36,* where Vice-Chancellor Emery (at *p. 41*) used the following language:

"Where an executor continues the business of testator under authority of the will, or merely for the purpose of winding up the business, his compensation for this service is included in his commissions as executor, and the basis for fixing commissions is not the gross receipts or expenses of the business, but the net income and the amount by which this increases the *corpus* of the fund, and cannot include a charge for services in continuing the business * · * *ₒ

"But the right of the executor to compensation [beyond his statutory commission on the amount of the estate coming to his hands] is based on other principles where the carrying on of the business is unauthorized. In such case the general rule is that the beneficiaries have the option to charge the executor either with the value of the estate and interest or with the amount of the net profits realized from the business.

"In estimating the profits, the general basis for charging trustees is that, so far as ascertainable, they should include only the profits resulting from the employment of the testator's estate as capital, and due allowance should be made for other elements creating the profits, such as the business skill and credit of the executor carrying it on. Compensation for executor's services may be allowed as part of the expenses of the business, and be deducted in ascertaining the net profits with which he is chargeable, but in carrying on the business without authority the executor is at the absolute risk that the estate which comes to his hands suffer no loss or dimunition by reason of carrying on the business. If the executor can show that there has been no loss, but rather a benefit to the estate, then no liability to the estate results from his illegal action other than that of accounting for the profits or benefits received, and in so accounting for the profits or benefits received, he may be allowed proper compensation for his services in carrying on the business, and such allowance will be deducted from the profits for which he is to account. These seem to be the general principles on which allowances in these cases are based. It might happen, therefore, that the actual com-

pensation to the executor in cases where the business was continued without authority would sometimes be larger than where authorized, and, therefore, fixed by the statute, but it is to be considered—first, that in the former case the continuance of the business is at the personal risk of the executors indemnifying the estate against loss, and also of being personally liable for debts, and secondly, that this court, in enforcing the liability of trustees, does not act as a court of penal jurisdiction or for the purpose of punishment, but only for the purpose of compelling restitution, or granting compensation for losses actually sustained."

In the present case the testator's will contained a provision giving his executor power to carry on his wagon business—the business here in question—as long as it may be advisable, without liability for any loss incurred in so doing. Obviously, this provision fully meets the requirement of empowering the executor expressly and unequivocally, and in distinct and positive terms, to carry on the business, and brings the case within the first branch of the rule in *Gilligan* v. *Daly,* above quoted.

It is therefore apparent that the accountant is not entitled to compensation for the services in question, except as it may be included in his commission, and the exception will, accordingly, be sustained.

At this point attention should be called to the rule regarding the burden of proof in cases of this character. The rule is well settled that in all matters of charge against the accountant the burden of proof is upon the exceptant. *Kirby* v. *Coles, 15 N. J. Law 441.* But in matters of discharge the burden is upon the accountant. *Kirby* v. *Coles, supra; Dufford* v. *Smith, 46 N. J. Eq. 216; Frey's Case, 73 N. J. Eq. 346; McCulloch* v. *Tomkins, 62, N. J. Eq. 262.*

In and by her eleventh exception exceptant objects to the allowance payed by accountant for payment to the Public Service Gas and Electric Companies, represented by vouchers 90, 116, 126 and 131, totaling $46.84. The vouchers filed consist of the accountant's canceled check. No other vouchers have been produced, nor is there any testimony by the

accountant that he has made any effort to procure receipts or receipted bills from the public service companies, much less that such voucher could not be obtained.

The accountant's testimony on the subject is as follows: "Q. Did the payment * * * represent the estate's indebtedness? A. As far as I know, yes. Q. Did it represent your own personal indebtedness? A. Not to my knowledge."

The accountant clearly has not sustained the burden of proof which rests upon him. The exception will therefore be sustained.

In and by her twelfth exception exceptant objects to a number of items prayed allowance by the accountant, which are represented by various vouchers, the numbers of which will be stated hereinafter. Most of these items have been disposed of by stipulation of counsel.

The part of the exception relating to vouchers 88, 114, 137, 168, 184, 186, 215, 228, 244 and 431 have been withdrawn.

The part of the exception relating to vouchers 191, Wolber & Blake, $375; 288, Broad and Market National Bank, $92.80; 316, E. D. Feytel, $15.47, and 343, Broad and Market National Bank, $180, were allowed to a total amount of $663.27. This leaves the items represented by vouchers 98, 203, 318, 360 and 425 to be considered.

Voucher 98 relates to a payment of $11.20 made to the "Sunday Call," a Newark newspaper. The vouchers are a canceled check and a receipted bill from the newspaper for "display," on December 12th, 1915. This bill was originally made out to E. S. Oliver, but above this typewritten name the words "H. M. Oliver estate," and below, the word "executor" have been inserted, evidently with a rubber stamp. The accountant admits that he stamped these words on the bill. He testifies further that the payment in question was for advertising certain sleds belonging to the estate for sale, and he calls attention to a charge in his account under date of December 14th, 1915, of $170, stated to be "cash for sleighs," and says that this sale was the result of the advertisement. While the question is rather a close one, on the whole I am not satisfied that the accountant has sustained

the burden of proof resting upon him. The alteration of the bill is suspicious. There is no reason to suppose that the files in the newspaper, showing the advertisement in question, are not in existence, and that even if such files were not readily obtainable for production in court, it would be a simple matter to obtain from the newspaper an endorsement of the bill, based upon an inspection of its own files by one of its employes, showing the subject of the advertisement, and it does not appear that the accountant has made any effort whatever to obtain or even to inspect such files. The exception regarding this item will therefore be sustained.

Voucher 203 relates to a payment of $70, stated to have been made to Doty & Keese, on February 13th, 1917, for plumbing at 322 Mt. Pleasant avenue, Newark, New Jersey. The voucher filed consisted only of the canceled personal check of the accountant. At the hearing, however, the proctor for the accountant produced an affidavit executed by one John Doty, stated to have been a member of said firm of Doty & Keese, and, while very properly conceding the incompetency of the affidavit as evidence, stated that Mr. Doty was unable to appear, and asked the exceptant's permission to introduce the affidavit by consent, to which the reply of exceptant's proctor was, "we will check it up with the bill." Nothing further appears in the record as to this affidavit, and exceptant's brief appears to make no objection to its consideration. It seems to be regular on its face, and its contents constitute an explicit and unequivocal statement that the work paid for by the check in question was done for the estate, and not for the accountant personally, and, further, that Doty & Keese at no time ever did any work for the accountant personally. The accountant testified to the same effect. In this posture of affairs, I believe that I have the right to regard the contents of the affidavit as in evidence by consent; and, considering them in connection with the accountant's testimony, it would appear that the accountant had sustained the burden of proof resting upon him. If exceptant's counsel desires to raise any objection to the con-

sideration of the affidavit, I will give him the opportunity to be heard on the question. In the absence of such an application the exception as to this item will be overruled.

Voucher 318 concerns a payment of $35.28, stated to have been made May 5th, 1919, to Benjamin Meyer Company, for hardware, &c., at 273 Mt. Pleasant avenue, Newark. The voucher filed is the accountant's canceled personal check. He testifies that this payment was for hardware "at the factory. I never bought any hardware off them myself." He does not mention any effort made by him to procure a proper voucher, and no reason is suggested why it should be impossible or even difficult to obtain one. This is clearly insufficient to support the burden of proof. The exception to this item will therefore be sustained.

Voucher 360 relates to a payment of $150, stated to have been made May 3d, 1920, to one L. J. Wurth, with the notation "cash."

The accountant's testimony as to this transaction is that the estate owed him money, some $2,000 or more; that he needed money, and that he paid Wurth $150 bonus or premium, or, in plain English, usury for a loan of $1,500, presumably to be used in paying the estate's said indebtedness to him. There is no competent testimony in the case that the estate was at any time indebted to the accountant in any sum whatever, but even though it were, it would not appear to affect the result. It may be that emergencies might arise in the course of the administration of an estate that would justify the borrowing of money on such terms by an executor. That is a question which I am not now called upon to decide, but that there was no justification for such a transaction in this case is too plain to warrant discussion. The exception as to this item will therefore be sustained.

Voucher 425 concerns a payment of $39, stated to have been made to one John Fischer on September 14th, 1923, for insurance premiums on property at 322 Mt. Pleasant avenue, Newark. Both the voucher and the testimony as to this item are substantially replicas of those relating to the item bearing voucher No. 318 of this exception, practically

the only difference being that here the accountant's signature to the check is followed by the word "trustee." This, of course, does not affect the result. The exception will accordingly be sustained as to this item.

In and by her thirteenth exception, exceptant, as in the preceding one, objects to a number of different items. As to one of which, that relating to voucher 331, the exception has been withdrawn. As to another, an item of $26, appearing in the account between the amount for vouchers 370 and 371, and having neither voucher number nor description, the exception is allowed to said amount by stipulation. This leaves for consideration the items bearing voucher numbers 129, 143, 151, 164, 297, 341 and 351.

Voucher 129 represents a payment of $1.50, stated to have been made May 11th, 1916, and described as "Mrs. J. Feytel, flowers." It appears to be undisputed that this transaction represented a payment by the accountant of his share of the cost of flowers sent by him and his sisters to the funeral of a relative, and has no relation to this estate or its administration. The exception as to this item should therefore be sustained.

Vouchers 143, 151, 164, 297, 341 and 351 all relate to payments totaling $275, made to Lum, Tamblyn & Colyer, as attorneys. The vouchers filed show nothing as to the nature of this alleged indebtedness, with the exception of one which bears a notation that the payment was made "on account of claim of the *Regina Company* v. *Oliver*." Mr. Feytel, the husband of the exceptant, testified that he was employed by his father-in-law, the testator, for some ten years before the latter's death, and kept his books, and he stated that from his knowledge of the testator's affairs in general he was sure that the debt in question was not the testator's. It is unnecessary to base any conclusion on this testimony, however, as the question can be disposed of on the accountant's own testimony. This was both vague and evasive in a very high degree, and amounted, in substance, to a statement that he could not say whether the debt was his father's

or his own. As the burden of proof is on him, it is needless for me to go further than to find that he has not sustained it. The exception will, as to these items, therefore, be sustained.

In and by her fourteenth exception exceptant objects to an allowance prayed for by the accountant of $150 paid to one Louis Wurth as bonus for a loan. This transaction, it is admitted by the accountant, consisted of borrowing from said Wurth, at a premium of $150, of the sum of $1,500, which was used in buying out the interest of the testator's widow, now Mrs. Noble, in this estate. The terms of this loan were, therefore, practically identical with those of the loan considered in exception 12, voucher 360, and all that has been said as to that transaction may be substantially repeated here. Assuming that the borrowing of money by an executor on such terms should ever be sanctioned by the court in any case whatever, this is not such a case. Mrs. Noble, under the will, received the furniture, a legacy of $500, and one-fourth of the residuary estate. That the borrowing of $1,500 as usurious rates for the purpose of purchasing her interest was not necessary or proper for the administration of the estate, and could be of benefit only to her co-legatees individually, is so obvious that argument would be idle. The exception will therefore be sustained.

In and by her fifteenth exception exceptant objects to an allowance prayed by the accountant for the sum of $720.26, paid to himself in repayment of advances to the same amount made to Eugene G. Oliver, who, it appears, is the accountant's son. The date stated for the payment to the accountant is July 23d, 1919. At what time or times the payments were made by him to his son does not appear.

By the terms of the testator's will, Eugene G. Oliver takes one-fourth of the residuary estate. The executor's account shows a balance in his hands of $20.54. The petition annexed to the account alleges that the estate is still indebted to the extent of $2,799.50, and further states that "considerable difficulties were experienced by your petitioner in preventing the estate being declared insolvent." The only justi-

fication that appears to be offered by the accountant for this item is his testimony, that at the time he made these payments, or some of them, to his son, the latter was in the army and was sick. His counsel does not suggest any justification for these payments. The exception will therefore be sustained.

In and by her sixteenth exception exceptant objects to the allowance prayed by the accountant for balances of $14.12 and $6.42 on deposit in the Broad and Market National Bank and the West Hudson County Trust Company, respectively. By stipulation of counsel these exceptions are sustained to the amount of $20.54.

In and by her seventeenth exception exceptant objects to allowances prayed by the accountant for payment to the West Hudson County Trust Company for interest on indebtedness of the estate. The exceptant claims that part of the indebtedness in question is that of the accountant personally. There is considerable testimony, must of it conflicting, as to the notes held by this trust company, and as to who was accommodated by or received the proceeds of the notes. But the fundmental difficulty regarding this exception, however, is that it is not directed to any particular item of discharge in the account, nor is there anything in the testimony or in the brief of counsel to elucidate the situation. It is the duty of exceptant to point out to accountant specifically the portions of the account objected to by her, and this exception is so vague and general that it cannot be allowed. The exception will therefore be overruled.

Exceptant's eighteenth objection is the subject of litigation in the court of chancery, and, by stipulation of counsel, is not to be considered by this court.

In and by her nineteenth exception exceptant alleges that the accountant failed to pay the taxes on the estate's real property promptly, whereby interest charges and costs accrued against the same, and certain named parts thereof were sold for non-payment of taxes for the year 1915. This exception has the same vice as is inherent in exception seventeen, and, while it is true that counsel for the exceptant in

his brief sets forth the list of particular vouchers, each one of which he claims represents a payment of interest, or interest and charges and costs, which the accountant should not have allowed to accrue, I feel that I cannot dispose of this exception better than to quote part of the language of accountant's brief:

"The exception filed by Mrs. Feytel did not specify in what particular the executor failed to promptly pay taxes, and the executor could not produce any further evidence than he did under the circumstances. * * *

"The proctor for the exceptant, in his memorandum, sets forth specific items, and, if he had done so in filing his exceptions, the executor would have been in a position to meet the contention now raised with additional evidence."

There must be an end to litigation, and, in view of the court's well-settled policy of almost unlimited liberality in permitting amendments to exceptions before or at the hearing, there can be no hardship to an exceptant in requiring him to state his exceptions with sufficient fullness and particularity to enable his adversary to meet them with his evidence, and to enable the court to have a definite issue before it to adjudicate. The exception will be overruled.

All of which is respectfully advised.